1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11  ROBERT A. WALLER, JR., on behalf of
himself and all others similarly situated,

12                                          Plaintiff,

13        vs.

14

15  HEWLETT-PACKARD COMPANY, etc.,
et al.,

16                                          Defendants.

17

CASE NO. 11cv0454-LAB (RBB)

**ORDER DENYING PLAINTIFF'S
MOTION FOR CLASS
CERTIFICATION**

18

19        The Court previously stayed this case pending the appeal of the denial of class

20  certification in *O'Shea v. Epson America, Inc.*, Case No. 9-CV-8063 (C.D. Cal.).  It expected

21  that on appeal the Ninth Circuit would confront and resolve a question that has become a

22  kind of spike strip in the class certification of lawsuits brought under California's Unfair

23  Competition Law.  *See* Case No. 11-57105.  That question, which hovers at the intersection

24  of substantive state law and federal constitutional law, is whether absent members of a

25  putative class action removed to federal court must have Article III standing, and if so, what

26  constitutes that standing.

27        The answer to the first prong is of substantial consequence, especially where, as here,

28  the underlying claim has no injury requirement but Article III standing does.  A putative class

may have standing under state law, and a winning claim, but then run into serious trouble in federal court when confronted with Article III standing requirements.  Simple removal by the defendant would be a game-changer.  It is also of substantial consequences because although the Ninth Circuit has held that "a district court's . . . denial of Rule 23 class certification does not divest the court of jurisdiction," *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. Shell Oil Co.*, 602 F.3d 1087, 1092 (9th Cir. 2010),  it might be otherwise if class certification fails at the outset for lack of standing, which is jurisdictional.  *Id.* at 1092 n.3.

A lot also turns on the answer to the second prong of the question.  Is it enough for Article III standing that a consumer bought a product with misleading packaging, or must the consumer have actually relied on the labeling to his or her detriment?  These are very different standards.  If the answer is the latter, it will be nearly impossible to certify these kinds of UCL cases because the reliance and injury inquiry will always be individualized. That is, a defendant will always be able to argue that whether consumers actually saw and relied on the labeling, and suffered some injury as a result, can't be resolved universally.

In any event, having reconsidered its decision to stay this case, and the parties' briefing on class certification, the Court is willing to keep this case moving by ruling on Waller's motion for class certification now.  The motion is **DENIED**.  Peripherally, Waller's motion to file documents under seal (Doc. No. 81) is **GRANTED**, as is the parties' joint motion to dismiss the CLRA claim (Doc. No. 80).

## I.   Legal Standard

"A party seeking class certification must satisfy the requirements of Federal Rule of Civil Procedure Rule 23(a) and the requirements of at least one of the categories under Rule 23(b)."  *Wang v. Chinese Daily News*, 709 F.3d 829, 832 (9th Cir. 2013).  The Rule 23(a) requirements are: "the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  In familiar

usage, these are the numerosity, commonality, typicality, and adequacy of representation requirements.

As far as Rule 23(b) is concerned, Waller seeks certification under Rule 23(b)(2) or, in the alternative, Rule 23(b)(3).  Certification under 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Traditionally, Rule 23(b)(2) only has traction where injunctive relief is the predominant form of relief sought, *see Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001), but the Supreme Court has recently called this narrow construction into question.  *See Wal-Mart v. Dukes*, 131 S.Ct. 2541, 2560 (2011); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011).  It's still the case, however, that individualized monetary claims are best certified, indeed may only be certified, under Rule 23(b)(3).  *See, e.g., Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 541–42 (N.D. Cal. 2012).  Under Rule 23(b)(3), class certification is appropriate where "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Because this is a restitution class action seeking predominantly monetary relief—Waller even styles and labels it as one—the Court won't consider certification under Rule 23(b)(2).  (Mot. for Class Cert. at 19 ("Plaintiff Waller seeks certification of a California restitution class . . . .).)  The predominance of monetary relief in this case is underscored by the fact that Waller likely can't benefit from injunctive relief anyway, considering he now knows exactly how the SimpleSave functions and what other devices in the marketplace are available and better-suited to his needs.  *See Moheb v. Nutramax Laboratories Inc.*, 2012 WL 6951904 at *7 (C.D. Cal. Sept. 4, 2012) ("Plaintiff cannot benefit from injunctive relief, and, thus, monetary relief is necessarily her primary concern.").  Finally, there is even a question whether Waller has standing to seek injunctive relief considering there's no risk of HP's alleged misrepresentations about the SimpleSave harming him in the future.  *See Cattie*

1  *v. Wal-Mart Stores, Inc.*, 504 F.Supp.2d 939, 951 (S.D. Cal. 2007).  HP raises all of these

2  arguments in its opposition brief and Waller offers no rebuttal to them in his reply.  For all of

3  these reasons, the Court will consider Waller's class certification motion under Rule 23(b)(3)

4  only.

5  **II.    Standing**

6       The Court starts with the question whether it must consider the standing of absent

7  class members at the class certification stage.

8       **A.    Caselaw**

9       The first case to mention is *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir.

10  2011), a UCL case involving an allegedly deceptive coupon program offered to Ticketmaster

11  customers after an online ticket purchase.  Before *Stearns* got to the Ninth Circuit, the district

12  court denied class certification at the Rule 23(b)(3) step in the class certification analysis,

13  finding, in the Ninth Circuit's words, that "individual issues predominated . . . because

14  individualized proof of reliance and causation would be required."  *Id.* at 1020.

15       The Ninth Circuit said this was wrong, chiefly because it found the district court got

16  the underlying, substantive law wrong.  Claims brought under the UCL are governed by the

17  reasonable consumer test, whereby a plaintiff need only show that members of the public are

18  likely to be deceived by the business practice at issue.  *Id.* at 1020; *see also Williams v.*

19  *Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).  In other words, under California law

20  there are no reliance and causation elements to a UCL claim in the first instance, and so "the

21  district court's concerns about reliance and causation were not well taken."  *Id.* (citing *In re*

22  *Tobacco II Cases*, 46 Cal.4th 298, 312 (Cal. 2009)).  (*Tobacco II* is a seminal case in which

23  the California Supreme Court clarified that "relief under the UCL is available without

24  individualized proof of deception, reliance, and injury."  46 Cal.4th at 320.  Along these very

25  lines, it held that elements of common law fraud aren't incorporated into a UCL claim, at least

26  one seeking injunctive relief.  *Id.* at 312.)

27       That being the law of the putative class's claim, Ticketmaster pitched another

28  argument: if class members don't need to suffer an actual injury connected to Ticketmaster's

1   conduct, the class must lack standing under Article III of the Constitution. The Ninth Circuit

2   again disagreed.  First, to the extent class members "were relieved of their money" by signing

3   up for the online coupon program at issue, that was enough of an injury to confer Article III

4   standing.  *Stearns*, 655 F.3d at 1021.  But second, and even more importantly, the Ninth

5   Circuit insisted that only the standing of the representative party matters anyway: "[O]ur law

6   keys on the representative party, not all of the class members, and has done so for many

7   years."  *Id.*; *see also Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) ("In

8   a class action, standing is satisfied if at least one named plaintiff meets the requirements .

9   . . .  Thus, we consider only whether at least one named plaintiff satisfies the standing

10  requirements.").

11          The next significant case is *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581

12  (9th Cir. 2012), which involved representations Honda made about an advanced braking

13  system in Acura RL cars.  The district court certified a nationwide class of consumers who

14  bought RLs equipped with the braking system, and the Ninth Circuit vacated its order.  Like

15  Ticketmaster in *Stearns*, Honda argued that if class members didn't need to actually rely on

16  the representations at issue and suffer some injury, the class lacked Article III standing.  But

17  rather than say, as it did in *Stearns*, that only the standing of the named plaintiff matters, it

18  cited a Second Circuit case for the opposite proposition that "[N]o class may be certified that

19  contains members lacking Article III standing."  *Id.* at 594 (quoting *Denney v. Deutsche Bank*

20  *AG*, 443 F.3d 253, 264 (2d Cir. 2006)).  It also immediately cited *Bates* and *Stearns*, which

21  ostensibly contradict *Denney*.  But perhaps little turned on this in the end, because the court

22  then said, directly in line with *Stearns*, that it was enough "that class members paid more for

23  the CMBS than they otherwise would have paid, or bought it when they otherwise would not

24  have done so, because Honda made deceptive claims."  *Id.* at 595.  No more particularized

25  proof of injury or causation was required.

26          Considering *Stearns* and *Mazza* alone, the relevance of Article III standing

27  considerations to the class certification analysis may seem overblown.  True, *Stearns* says

28  absent class members don't need standing and *Mazza* says they do, but *Mazza* cites

*Stearns* (and another case in line with it), and seems to set a rather low bar for standing anyway. Simply spending money on something that doesn't do what it claims to do is all the injury absent class members need.

The issue becomes more confusing in light of a number of conflicting district court opinions, some issued before *Stearns*, some issued after *Stearns* and before *Mazza*, and some issued after *Mazza*. Two of the earlier cases, pre-*Stearns*, are *Burdick v. Union Sec. Ins. Co.*, 2009 WL 4798873 (C.D. Cal. Dec. 9, 2009), and *Sanders v. Apple*, 672 F.Supp.2d 978 (N.D. Cal. 2009). Neither case dealt directly with a class certification motion—*Burdick* ruled on a motion to decertify a class and *Sanders* ruled on a motion to strike class action allegations—but they are instructive nonetheless. Both took the position *Mazza* would later take. In *Burdick* the court held that "absent class members lacking justiciable claims under Article III should be excised from the case." *Burdick*, 2009 WL 4798873 at *4. In *Sanders*, which involved representations Apple made about the visual display capabilities of certain iMac computer monitors, the court cited the very Second Circuit case relied on in *Mazza* and held that a class can't be certified with members lacking Article III standing. *Sanders*, 672 F.Supp.2d at 991. *But see Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 376 (N.D. Cal. 2010) ("Though federal courts are not bound by the decisions of the state supreme court on matters of federal law, the court notes that in *In re Tobacco II Cases* the California Supreme Court concluded after a reasoned analysis that unnamed class members in an action under the Unfair Competition Law . . . are not required to establish standing.").

Discussions of the issue became somewhat more robust starting with *Webb v. Carter's Inc.*, 272 F.R.D. 489 (C.D. Cal. 2011). In *Webb*, which was decided before *Stearns*, the court acknowledged that "there is no controlling authority requiring absent class members, as opposed to the named plaintiffs, to satisfy Article III's standing requirements," but it required them to anyway. *Id.* at 497. The case involved allegations that tagless labels printed inside infant clothing contained toxic chemicals that could cause adverse skin reactions, and the court held that a class of purchasers lacked Article III standing because most infants wore the clothes without incident. *Id.* at 498–99. It didn't matter, moreover, that

1  plaintiffs' alleged injury "rest[ed] on their theory that purchasers lost the benefit of their
2  bargain because they parted with money for a defective product."  The court held that the
3  defect still didn't affect all purchasers and wasn't responsible for any inevitable or imminent
4  harm.  *Id.*

5      Following *Webb*, and still before *Stearns*, a court in the Northern District of California
6  seemed to side with it, although on a close reading it really departed.  *See Zeisel v. Diamond*
7  *Foods, Inc.*, 2011 WL 2221113 (N.D. Cal. June 7, 2011).  The plaintiff in *Zeisel* alleged that
8  Diamond misrepresented the health benefits of walnuts on package labels.  The court did,
9  consistent with *Webb*, see fit to "ensure that absent class members have standing," but it did
10  that "by conducting a rigorous analysis of the Rule 23 requirements."  *Id.* at *5.  And in that
11  analysis, particularly while discussing Rule 23(b)(3), it recognized that relief is available
12  under the UCL without an actual injury and effectively waved off the element of Article III
13  standing that the court in *Webb* took so seriously.  *Id.* at  *9.  Indeed, it certified the class.

14      *O'Shea v. Epson America, Inc.*, 2011 WL 4352458 (C.D. Cal. Sept. 19, 2011) decided
15  after *Stearns*, more or less sided with *Webb*.  The plaintiff in *O'Shea* claimed that Epson
16  misrepresented the functionality of ink cartridges for computer printers.  The court held that
17  absent class members were required to have Article III standing.  *Id.* at *8.  It acknowledged
18  that  *Bates* and *Stearns* held that only the standing of the named plaintiff matters, but it
19  distinguished them on the ground that the defendants in those cases were only challenging
20  the standing of the named plaintiffs, meaning the Ninth Circuit technically wasn't resolving
21  the further question whether absent members of a putative class must satisfy Article III
22  standing requirements.  *Id.* at *9–10 ("In sum, while the Ninth Circuit has clearly spoken to
23  the question of whether a *named* plaintiff must have standing, this precedent does not
24  compel the conclusion that a class may be certified where members lack standing.").  It went
25  on to conclude that individual questions predominated in the standing analysis for absent
26  class members because "the putative class is defined such that it necessarily encompasses
27  individuals whose purported injury cannot fairly be traced to Epson's alleged
28  misrepresentation on the printer box."  *Id.* at *11.

1    Shortly after *O'Shea* was decided, and in that same post-*Stearns* and pre-*Mazza*

2  window, another judge in the Central District of California went the other way.  *See Bruno v.*

3  *Quten Research Inst., LLC*, 280 F.R.D. 524 (C.D. Cal. 2011).  *Bruno* is somewhat similar to

4  *Zeisel* in its facts; the plaintiff alleged that the defendant misrepresented the effectiveness

5  of an active ingredient in a dietary supplement.  Faced with the defendant's argument that

6  the absent class members had to have Article III standing, and its reliance on *O'Shea* for this

7  argument, the court noted that "the majority of authority indicates that it is improper for this

8  Court to analyze unnamed class members' Article III standing where, as here, Defendants

9  do not successfully challenge the putative class representative's standing."  *Id.* at 532.  *See*

10  *also Aho v. Americredit Fin. Servs., Inc.*, 277 F.R.D. 609, 623 (S.D. Cal. 2011) ("Defendant

11  next argues that all class members must satisfy Article III standing . . . .  However, in

12  *Stearns*, the Ninth Circuit stated that its law 'keys on the representative party, not all of the

13  class members, and has done so for years.'").  Indeed, it did what the court in *Zeisel* did,

14  which is consider the specificity of absent class members' claims vis-a-vis those of the

15  plaintiff under Rule 23.  *Id.* at 533.  The court also suggested that even if absent class

16  members needed Article III standing, it was enough following *Stearns*, and as it would be

17  later in *Mazza*, that they purchased a product containing misrepresentations.  *Id.* at 531–32.

18   *See also In re Google Adwords Litig.*, 2012 WL 28068 at *10 (N.D. Cal. Jan. 5, 2012) ("This

19  court is persuaded by the well-reasoned analysis in *Bruno* and concludes that where one

20  class representative in a UCL or FAL class action has already established Article III standing,

21  the court need not analyze the standing of unnamed class members.").

22    In early 2012, still before *Mazza* was decided, a judge in the Eastern District of

23  California sided with the *Webb* and *O'Shea* line of cases.  *See Gonzales v. Comcast Corp.*,

24  2012 WL 10621 (E.D. Cal. Jan. 3, 2012).  The case involved accusations that Comcast's

25  billing practices with respect to cancelling consumer accounts were misleading, and the court

26  said "a class must be defined in such a way that anyone within it would have standing."  *Id.*

27  at *7.

28    In the wake of *Mazza*, many courts have acknowledged and ostensibly followed its

directive that absent class members must have Article III standing.  *See, e.g., Walker v. Life Ins. Co. of the Sw.*, 2012 WL 7170602 (C.D. Cal. Nov. 9, 2012); *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 474–75 (C.D. Cal. 2012); *Tietsworth v. Sears, Roebuck and Co.*, 2012 WL 1595112 at *14 (N.D. Cal. May 4, 2012); *Baxter v. Rodale*, 2012 WL 1267880 at *2 (Apr. 12, 2013); *In re TFT-LCD (Flat Panel Antitrust Litig.*, 2012 WL 253298 at *1 n.2 (N.D. Cal. Jan. 26, 2012).  Some courts have recognized the apparent *Stearns-Mazza* split—and sided with the reasoning of *Stearns.  See, e.g., Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523 (N.D. Cal. 2012); *Arnott v. United States Citizenship and Immigration Servs.*, 2012 WL 8527788 at *3–4 (C.D. Cal. Oct. 22, 2012) ("This single line in *Mazza*, unexplained and absent any discussion of prior Ninth Circuit precedent, directly contradicts *Bates*, which was rendered *en banc*.").  Other courts have seen that *Stearns* and *Mazza* conflict and taken no position.  *See, e.g., Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 565 (W.D. Wash. 2012) ("It is unclear whether a putative class representative is required to show only that she has standing or must also show that all members of the class have standing.").  And still others have followed *Stearns* without acknowledging *Mazza* at all.  *See, e.g., Astiana v. Kashi Co.*, 2013 WL 3943265 at *3 (S.D. Cal. July 30, 2013).

Of this bunch of cases, *Astiana*, *Reis*, and *L'Oreal* come closest on their facts to this case, because each is essentially a product labeling case.  *Astiana*, to start, was brought by a purchaser of Kashi food products who challenged representations that they are "All Natural" and contained "Nothing Artificial."  At the class certification stage, Kashi argued that absent class members needed Article III standing, and additionally that some members lacked it because they either didn't see the alleged misrepresentations or weren't influenced by them in their purchasing decisions.  The court quickly cited *Stearns* for the rule that only one named plaintiff needs to satisfy Article III standing requirements.  *Astiana*, 2013 WL 3943265 at *3.

*Ries*, almost identical to *Astiana*, involved a challenge to representations on Arizona Iced Tea that the drink is "All Natural," considering that it contains high fructose corn syrup and citric acid.  At the class certification stage, Arizona argued that the class definition was

overbroad because it implicated absent class members who lacked Article III standing.  The court disagreed.  First it reasoned, as the court in *Bruno* did, that it was improper to layer a standing requirements for absent class members on top of Rule 23's class certification standard.  *Ries*, 287 F.R.D. at 536.  Then it concluded, anyway, that no absent class member lacked standing by definition because *all of them* bought a product with the alleged "All Natural" misrepresentation on it: "Thus, although we follow the decisions holding that plaintiffs need not introduce evidence to establish the Article III standing of absent class members at this time, any inquiry into whether the unnamed class members satisfy Article III standing depends upon an objective test, not a fact-intensive inquiry as Defendants contend."  *Id.* (internal quotations and citation omitted).

The allegations in *L'Oreal* were straightforward: L'Oreal produced and marketed a hairstyling product that wasn't properly labeled as flammable, and was in fact *mis*labeled as being safe when used in proximity to heat-producing styling appliances.  The court quoted *Mazza*'s rule that "[n]o class may be certified that contains members lacking Article III standing," but then it immediately quoted *Stearns*'s rule that "[i]n a class action, standing is satisfied if at least one named plaintiff meets the requirements."  *L'Oreal*, 284 F.R.D. at 474–75.  Ultimately, however, it followed *Stearns* and looked only at the two named plaintiffs in the case, both of whom had standing because "had they known [the product] was flammable, they would have paid less than its retail price or would not have purchased it at all."  *Id.* at 475.  The injury, in other words, was economic; the plaintiffs "suffered a loss in value and usefulness of [the product]" because of the allegedly improper labeling.  *Id.* at 475.

### B.    Discussion

Having considered the caselaw, the Court sides with the conclusion in *Bruno* that "where the class representative has established standing and defendants argue that class certification is inappropriate because unnamed class members' claims would require individualized analysis of injury or differ too greatly from the plaintiff's, a court should analyze these arguments through Rule 23 and not by examining the Article III standing of

1   the class representative or unnamed class members." *Bruno*, 280 F.R.D. at 533.  There

2   are three reasons for this.

3          First, the contrary rule in *Mazza* comes in a single sentence that cites Second

4   Circuit authority without even acknowledging the earlier Supreme Court and Ninth Circuit

5   authority it is contradicting.  *See Lewis v. Casey*, 518 U.S. 343, 395 (1996) ("One class

6   representative has standing, and with the right to sue thus established . . . the propriety of

7   awarding classwide relief . . . does not require a demonstration that some or all of the

8   unnamed class could themselves satisfy the standing requirements for named plaintiffs.")

9   (Souter, J., concurring); *Ellis*, 657 F.3d at 978–79; *Stearns*, 655 F.3d at 1021; *Bates*, 511

10  F.3d at 985.  If the *Stearns* and *Bates* rule only applies when defendants are challenging

11  the standing of *named* plaintiffs, and it simply doesn't cover what absent class members

12  must show, the cases could and should have been much more clear about that.  Instead,

13  the Ninth Circuit held in *Stearns* that "our law keys on the representative party, not all of

14  the class members, and has done so for many years." *Stearns*, 655 F.3d at 1013.  It is

15  hard to read this, as the court in *O'Shea* did, as speaking only to the question whether a

16  named plaintiff must have standing.  This court isn't the first to defer to *Stearns* even after

17  *Mazza* was decided.  *See, e.g., Astiana*, 2013 WL 3943265 at *3; *Ries*, 287 F.R.D. at

18  536; *Arnott*, 2012 WL 8527788 at *3 ("This single line in *Mazza*, unexplained and absent

19  any discussion of prior Ninth Circuit precedent, directly contradicts *Bates*, which was

20  rendered en banc.").

21         Second, as the Court will reiterate below, *HP* removed this case to federal court,

22  where it doesn't necessarily have to be.  *See Guenther v. Crosscheck Inc.*, 2009 WL

23  1248107 at *5 (N.D. Cal. Apr. 30, 2009); *Vallier v. American Fidelity Assurance Corp.*,

24  2008 WL 4330028 at *3 (D. Kans. Sept. 16, 2008) ("CAFA does not mandate that class

25  actions of any variety—'multi-state' or otherwise—be filed in federal court.").  It would be

26  an unfair result in this case if HP could do that and then seize on federal constitutional

27  standing requirements to say the case cannot proceed as a class action.  What is likely

28  the case is that HP, for perfectly understandable reasons, doesn't like that relief is

11cv0454

1  available under the UCL without any proof of reliance or injury, and it is trying to backdoor

2  those elements into this case with an Article III standing requirement.  *See Stearns*, 655

3  F.3d at 1021 ("Basically, Appellees' real objection is that state law gives a right to

4  monetary relief to a citizen suing under it (restitution) without a more particularized proof

5  of injury and causation.  That is not enough to preclude class standing here.").

6        Third, in all of the cases surveyed above, not one involving product labeling and

7  alleged misrepresentations was stopped in its tracks on standing grounds at the class

8  certification phase, as HP attempts to accomplish here.  *See Astiana*, 2013 WL 3943265

9  at *3; *Ries*, 287 F.R.D. at 536; *L'Oreal*, 284 F.R.D at 474–75; *Bruno*, 280 F.R.D. at 532;

10  *Zeisel*, 2011 WL 2221113 at *5; *Chavez*, 268 F.R.D. at 376.  To the contrary, each of

11  these cases was certified for class treatment to some degree.

12        **C.    Standing**

13        Even if the Court is wrong to conclude that the Article III standing of absent class

14  members is irrelevant at the class certification stage, it would find the absent class

15  members have Article III standing here anyway.  But this raises another close question.

16  In *Mazza* the Ninth Circuit explained that "standing requires that (1) the plaintiff suffered

17  an injury in fact . . . (2) the injury is fairly traceable to the challenged conduct, and (3) the

18  injury is likely to be redressed by a favorable decision."  *Mazza*, 666 F.3d at 594 (internal

19  quotations and citation omitted).  The meaning of this isn't entirely clear in the context of a

20  UCL lawsuit alleging misrepresentations on a product's packaging.

21        On the one hand, it is enough if a plaintiff bought a product containing the alleged

22  misrepresentations, plain and simple, *even if* the misrepresentations didn't affect their

23  purchasing decision in any way.  *See Bruno*, 280 F.R.D. at 531 ("The Ninth Circuit

24  reasoned that a concrete injury sufficient for Article III standing was shown by the

25  California UCL's requirement that the plaintiff and class members suffer an economic loss

26  caused by the defendant, namely the purchase of defendant's product containing

27  misrepresentations.").  *See also In re Google AdWords Litig.*, 2012 WL 28068 at *10

28  (suggesting that merely being "relieved of money" is sufficient for Article III standing);

*Astiana*, 2013 WL 3943265 at *3 (citing *In re Google AdWords*); *Ries*, 287 F.R.D. at 536 ("The focus of the UCL and FAL is on the actions of the defendants, not on the subjective state of mind of the class members."). The idea here is that simply buying a product that doesn't do what it claims is an automatic economic injury, even if the misrepresentation is irrelevant to the purchaser's usage. *See Hinojos v. Kohl's Corp.*, 2013 WL 2159502 at *9 n.3 (9th Cir. Jan. 10, 2013).

On the other hand, however, the injury must be caused by, or traceable to, the defendant's conduct in some thicker sense: the plaintiff must have actually focused on the alleged misrepresentations in deciding to buy the product, and suffered some injury by relying on the misrepresentation.

The difference here is as significant as it is nuanced. If it's enough for standing that an absent class member bought a product containing a misrepresentation, even if he didn't notice it or wasn't influenced by it, standing won't present much of a problem in the certification of these kinds of cases. It will be enough that absent class members have a product of diminished capabilities and therefore diminished economic value, even if that's irrelevant to their needs and was irrelevant to their purchasing decision. If, however, absent class members must have relied on the alleged misrepresentations in some way, standing will present a huge problem because that reliance inquiry will almost invariably be a highly individualized one. A defendant will always be able to argue, credibly, that whether a consumer actually saw and relied on the representations at issue cannot be resolved on a classwide basis.

Having considered the matter, the Court thinks it is enough for Article III standing if absent class members simply bought a product containing the alleged misrepresentations at issue, for four reasons. The first reason for this was just given. If it is otherwise—if Article III standing requires that a plaintiff actually relied on the misrepresentations—then class actions of this kind will almost always be dead on arrival in federal court. All a defendant has to do is remove them under the Class Action Fairness Act and then argue that they can't proceed as class actions because the question of causation—the question

11cv0454

1   of the injury being "traceable" to the defendant's conduct—is necessarily individualized.

2   Plaintiffs will rarely have a rebuttal to that.

3        Another reason was ably articulated by the court in *In re Google Adwords*.  As the

4   court explained in that case, "[t]he requirements of Article III turn on the nature of the

5   claim that is asserted," and in California relief under the UCL and FAL is available without

6   individualized proof of deception, reliance, and injury.  *In re Google AdWords*, 2012 WL

7   28068 at *10.  This is because the UCL is focused "on the defendant's conduct, rather

8   than the plaintiff's damages, in service of the statute's larger purpose of protecting the

9   general public against unscrupulous business practices."  *In re Tobacco II Cases*, 46

10  Cal.4th at 312.  *See also Stearns*, 655 F.3d at 1021 ("That law, as already noted, keys on

11  the wrongdoing of Appellees and is designed to protect the public (including the proposed

12  class members).")  That being the law of the substantive claims at issue in this case, it

13  makes little sense to concoct and impose a standard for Article III standing that effectively

14  contains the very reliance and deception requirements the actual claims do not.  That is

15  basically what HP is asking the Court to do here.  Even though there's no reliance or

16  deception element to a UCL claim under California law, it wants the Court to impose one

17  under Article III as a matter of federal constitutional law in order to find that the absent

18  class members have standing.  It wants the Court to impose a requirement for *bringing* a

19  claim that isn't required for actually *having* a claim in the first place.  The Court won't do

20  that.

21       Third, the Court thinks that HP's conception of an injury under Article III is too

22  narrow.  Certainly, if a consumer buys a product on the basis of a representation that

23  turns out to be misleading, he is out some amount of money.  But there is also an

24  economic loss, albeit less tangible, where a product simply doesn't do something it

25  purports to do---irrespective of whether that hampers the consumer's intended use and

26  irrespective of its hypothetical, retrospective impact on the consumer's purchasing

27  decision.  *See Walker*, 2012 WL 7170602 at *16 ("Where undisclosed features adversely

28  increase the investment's risk and/or decrease the investment's return, it is entirely

1  consistent with basic rules of economics that they would be overpriced in the

2  marketplace.").  A car with dysfunctional headlights, for example, is simply less useful and

3  therefore less valuable than one with working headlights; it's no rebuttal to say that the

4  owner of the former doesn't drive the car at all or drives it only in broad daylight and never

5  in tunnels.  Everyone who pays for a car is paying some amount of money for working

6  headlights.

7        Fourth, the argument against classwide standing rests on a distinction the Court

8  finds too permeable to be useful.  That distinction is between "defects" that are present at

9  the time of a sale, and that are imminent, unmitigatable, and pose a constant risk of harm,

10 *and* defects that are hypothetical and may never cause a consumer any injury or loss in

11 value.  *See Webb*, 272 F.R.D. at 499 (citing *Birdsong v. Apple, Inc.*, 590 F.3d 955, 961

12 (9th Cir. 2009).  The court in *Webb* found that members of the proposed class lacked

13 standing because the allegedly toxic chemicals in the tagless clothing labels didn't cause

14 all children who wore them to suffer an adverse reaction.  Only those children with

15 sensitive skin were at risk, and even they weren't guaranteed to have a reaction.  But one

16 could equally argue that defective headlights don't pose any risk of harm to a car owner

17 who will never have the occasion to turn them on, or, to borrow from a real case, that

18 defective airbag sensors are only defective to those drivers who might be or are in an

19 accident.  *See Cole v. Gen. Motors Corp.*, 484 F.3d 717, 722 (5th Cir. 2007).  The point

20 here is that, on some level, the question of injury caused by a product will *always* be

21 hypothetical; it will always turn on an individual's particular usage of that product. For all

22 of these reasons, the Court finds that even if it is required to assess the Article III

23 standing of absent class members in this case, they have it.

24 **III.    Rule 23 Analysis**

25        The Court can now turn to the substantive Rule 23 class certification analysis.

26 The class Waller seeks to certify consists of "all persons who purchased a Hewlett-

27 Packard SimpleSave external backup device (of whatever capacity) in the State of

28 California at any time from March 27, 2006 (within four years of Waller's purchase on

1  3/27/10) until final disposition of this case."  (Doc. No. 82 at 2.)

2  **A.   Numerosity**

3  Numerosity is satisfied if the potential class is so large that joinder of individual

4  plaintiffs is impracticable.  Fed. R. Civ. P. 23(a)(1).  A class greater than forty members

5  often satisfies this requirement, and a far larger class is implicated here.  *See Californians*

6  *for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D. 334, 346 (N.D. Cal. 2008).

7  In fact, Waller presents evidence that 87,000 SimpleSave devices were shipped to

8  California for sale, which HP does not contest.  Nor does HP contest that numerosity is

9  satisfied here.  The Court finds that it is.

10  **B.   Commonality**

11  The commonality requirement is that there be "questions of law or fact common to

12  the class."  Fed. R. Civ. P. 23(a)(2).  It is construed permissively, and indeed less

13  rigorously than the predominance requirement of Rule 23(b)(3).  *Hanlon v. Chrysler*

14  *Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).  "All questions of fact and law need not be

15  common to satisfy the rule.  The existence of shared legal issues with divergent factual

16  predicates is sufficient, as is a common core of salient facts coupled with disparate legal

17  remedies within the class."  *Id.*  Indeed, "commonality only requires a single significant

18  question of law or fact."  *Mazza*, 666 F.3d at 589.

19  It's clear enough that HP disputes commonality in this case, but it's unclear exactly

20  why.  In its opposition to class certification, HP doesn't address commonality specifically

21  and instead lumps it together, under a single heading, with predominance, superiority,

22  and other prerequisites to class certification.  The Court finds the requirement is satisfied

23  here anyway, especially given its permissive construction and the fact that "[a]ll questions

24  of fact and law need not be common to satisfy the rule."  *Astiana*, 2013 WL 3943265 at

25  *4.  *See also Ries*, 287 F.R.D. at 537 ("[V]ariation among class members in their

26  motivation for purchasing the product, the factual circumstances behind their purchase, or

27  the price that they paid does not defeat the relatively 'minimal' showing required to

28  establish commonality.").

1    For commonality to be satisfied, Waller's claims "must depend on a common

2    contention," and it "must be of such a nature that it is capable of classwide

3    resolution—which means that determination of its truth or falsity will resolve an issue that

4    is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S.Ct. at

5    2551.  In this case, the common contention is that HP misrepresented how the

6    SimpleSave works and what it can do, in violation of California's UCL, and that all

7    members of the putative class were misled.  One question that raises is whether the

8    representations at issue are likely to deceive the average consumer—a question that can

9    be answered uniformly in either the positive or negative.  This is enough to establish

10   commonality.  Even a case *denying* class certification on which HP heavily relies says so.

11    *See Konik v. Time Warner Cable*, 2010 WL 8471923 at *5 (C.D. Cal. Nov. 24, 2010)

12   ("Here, the primary common question is whether the marketing materials that Defendant

13   acknowledges sending to Adelphia subscribers en masse contained had the capacity to

14   deceive customers . . . .  The fact that each consumer purchase was an independent act

15   has no bearing on the common nucleus of facts in issue here: Defendant's conduct.").

16   The Court finds that the commonality requirement is satisfied.

17        **C.    Typicality**

18        Rule 23(a)(3) requires the representative party to have claims or defenses that are

19   "typical of the claims or defenses of the class."  The purpose of this requirement "is to

20   assure that the interest of the named representative aligns with the interests of the class."

21   *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  "The test of typicality is

22   whether other members have the same or similar injury, whether the action is based on

23   conduct which is not unique to the named plaintiffs, and whether other class members

24   have been injured by the same course of conduct."  *Id.*  This requirement "is permissive

25   and requires only that the representative's claims are reasonably co-extensive with those

26   of the absent class members; they need not be substantially identical."  *Hanlon*, 150 F.3d

27   at 1020. The focus should be on the defendant's conduct and the plaintiffs' legal theory,

28   not the plaintiffs injury, especially where, as in this case, the injury is established by an

1   objective test of a consumer purchasing a product with a material misrepresentation.

2   *Astiana*, 2013 WL 3943265 at *6.  *See also Wolin v. Jaguar Land Rover North America,*

3   *LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ("Typicality can be satisfied despite different

4   factual circumstances surrounding the manifestation of the defect.").

5          Taking all of this law in, it is hard to see how the typicality requirement isn't

6   satisfied here.  Waller's claim is that HP misrepresented the capabilities and functioning

7   of the SimpleSave and that he relied on these misrepresentations in buying one, and that

8   is also the claim of members of the putative class: they bought a product containing a

9   misrepresentation and now own an external hard drive of diminished utility.  These claims

10  are certainly "reasonably co-extensive."  *Hanlon*, 150 F.3d at 1020.  The injuries are

11  economic in both instances and call for the same remedy: a refund of the value difference

12  between a SimpleSave that is truly hands-free and one that requires a modicum of user

13  programming if it is to save uncommon file types.  *See Astiana*, 2013 WL 3943265 at *6.

14  The fact that some purchasers were moved by the alleged misrepresentations in different

15  ways, or not moved by them at all for that matter, is incidental to the typicality analysis.

16  *Id.*     This is especially true, as with the commonality analysis, considering that "the test

17  for California's consumer protection statutes is objective, and does not turn on the

18  claimant's particular state of mind."  *Ries*, 287 F.R.D. at 539.  "Typicality refers to the

19  nature of the claim or defense of the class representative, and not to the specific facts

20  from which it arose or the relief sought."  *Hanon*, 976 F.2d at 508 (internal quotations and

21  citation omitted).  The nature of Waller's claim is that HP sold a product with misleading

22  labeling, and that is the claim of the putative class as well.

23          HP argues that typicality isn't satisfied here because the falsity or deceptiveness of

24  the representations at issue actually turns on an examination of each purchaser's own

25  computer files.  This is because HP's representation that the SimpleSave automatically

26  backs up *all* file types might have been true for some of them, namely those who didn't

27  have any of the outlier file types that the SimpleSave actually had to be programmed to

28  back up.  HP relies on *Konik* for this argument.  Konik sued Time Warner Cable after it

11cv0454

1  acquired his previous cable provider Adelphia.  After the acquisition, Time Warner

2  circulated a flyer saying "Your price will remain the same," and this turned out not to be

3  true for subscribers like him who previously had analog service and lost certain stations

4  that were transferred to a more expensive digital feed.  *Konik*, 2010 WL 8471923 at *2.

5  The Court held that the challenged statement—"Your price will remain the same"—wasn't

6  actually false as applied to all (or even most) class members, and that Konik's claims

7  "cannot be typical of hundreds of thousands of subscribers for whom the statements in

8  question were actually correct and not deceptive."  *Id.* at *9.  HP argues that this case is a

9  lot like *Konik*, and that it's distinguishable from a number of comparatively straightforward

10  product labeling cases in which "the allegedly offending statements were either uniformly

11  true or uniformly false across the entire putative class." (Opp'n Br. at 10.)

12      It is not a frivolous argument—arguably, in context having an analog television

13  setup is no different from using WordPerfect—but the Court disagrees with it.  For

14  starters, this is a product labeling case, unlike *Konik* and like the many food labeling

15  cases on which Waller relies and which the Court has cited thus far.  Second, the

16  representation at issue here—that the SimpleSave automatically backs up all file

17  types—*is* either absolutely true or absolutely false.  It may back up all of a *purchaser's*

18  files, but that just means the purchaser is lucky, and it doesn't mean that he possesses a

19  product that's of less utility than is advertised.  The representation in *Konik* that "Your

20  price will remain the same," by contrast, is literally tied to the user's circumstances and

21  necessarily contingent on his particular television setup.  Those Adelphia subscribers who

22  already had digital cable when Time Warner took over, and who HP would presumably

23  argue are analogous to SimpleSave purchasers with no outlier file types, weren't harmed

24  in any conceivable way by the transition to digital cable.  The SimpleSave purchasers with

25  no outlier file types were, however.  They bought and now own a device that just doesn't

26  do what it's alleged to do, and is therefore of diminished utility and value.  *See L'Oreal*,

27  284 F.R.D. at 479 (finding typicality was satisfied where "each named plaintiff testified

28  that she would not have purchased Serum or would have paid less for Serum had she

1   known it had flammable characteristics").  It simply isn't the case, as HP wants to argue,

2   that the statements on the SimpleSave box such as "Just plug it in," "No software to

3   install, no files to select," and "Automatic, hands-free backup" aren't either uniformly true

4   or uniformly false.  For the above reasons, the Court finds that the typicality requirement

5   is satisfied in this case.

6          **D.    Adequacy**

7          Under the adequacy requirement of Rule 23(a)(4), Waller must establish that he

8   "will fairly and adequately protect the interests of the class."  There are two prongs to this.

9   The first asks whether "the named plaintiffs and their counsel have any conflicts of

10  interest with other class members," and the second whether "the named plaintiffs and

11  their counsel will prosecute the action vigorously on behalf of the class."  *Hanlon*, 150

12  F.3d at 1020.  HP doesn't appear to contest adequacy here and the Court sees no reason

13  to doubt it.  It therefore finds this final Rule 23 factor is satisfied at this juncture in the

14  analysis, although it will return to the issue below.

15         **E.    Predominance and Superiority**

16         Certification under Rule 23(b)(3) is proper "whenever the actual interests of the

17  parties can be served best by settling their differences in a single action."  *Hanlon*, 150

18  F.3d at 1022.  It calls for two separate inquires.  First, do questions common to the class

19  predominate over questions that are unique to individual class members?  And second, is

20  the proposed class action superior to other methods available for adjudicating the

21  controversy, namely individual lawsuits?  In answering these questions, the Court has to

22  consider: (1) the extent and nature of any pending litigation commenced by or against the

23  class involving the same issues; (2) the interest of individuals within the class in

24  controlling their own litigation; (3) the convenience and desirability of concentrating the

25  litigation in a particular forum; and (4) the manageability of the class action.  Fed. R. Civ.

26  P. 23(b)(3)(A)–(D).

27         The Court has already determined that there is a common issue to resolve the

28  issue of liability, namely whether the SimpleSave packaging misrepresents the device's

1   actual functionality, and that is largely why this class action passes Rule 23(a)'s

2   requirements.  *See In re Google AdWords Litig.*, 2012 WL 28068 at *14.  But the

3   predominance analysis under Rule 23(b)(3) is more stringent; it presumes that

4   commonality and typicality have been satisfied and focuses on the relationship between

5   the common and individual issues.  *Hanlon*, 150 F.3d at 1022.  Class certification under

6   Rule 23(b)(3) is proper "when common questions present a significant portion of the case

7   and can be resolved for all members of the class in a single adjudication."  *Astiana*, 2013

8   WL 3943265 at *8.  The superiority requirement, for its part, tests whether "classwide

9   litigation of common issues will reduce litigation costs and promote greater efficiency."

10  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  "If each class

11  member has to litigate numerous and substantial separate issues to establish his or her

12  right to recover individually a class action is not proper."  *Zinser*, 253 F.3d at 1192.  It's at

13  this juncture of the class certification analysis that HP offers the most arguments, which

14  the Court will address individually.

15              **1.      Individualized Questions of Reliance and Injury**

16          HP argues that individual issues predominate because of purchasers' different

17  understanding of how the SimpleSave operates; some may have read the

18  representations on the box carefully, some may have read the user manual, and some

19  may have had previous experience with it that was educational.  (Opp'n Br. at 12–13.)

20  Likewise, HP argues that individual inquiries are necessary to determine if class members

21  relied on the alleged misrepresentations to their detriment, or if those misrepresentations

22  were material to their purchase.  Some may have not had any files that the SimpleSave

23  wasn't automatically programmed to save, others may not have actually seen the

24  misrepresentations at issue, and still others may not have factored the alleged

25  misrepresentations into their buying decision, impressed more by the HP brand and the

26  SimpleSave's storage capacity.  (Opp'n Br. at 15–17.)  All of these arguments, in the

27  Court's view, rest on a fundamental understanding of what a UCL and FAL claim require,

28  which is very little.

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. and Prof. Code § 17200.  The FAL prohibits any "unfair, deceptive, untrue, or misleading advertising."  Cal. Bus. and Prof. Code § 17500.  A violation of the UCL's fraud prong is also a violation of the FAL, and likewise, a violation of the FAL necessarily violates the UCL.  *See In re Tobacco II Cases*, 46 Cal.4th at 312 n.8; *Williams*, 552 F.3d at 938.  For liability to attach under these statutes, it is necessary to show only that members of the public are likely to be deceived.  *Williams*, 552 F.3d at 938; *see also Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal.App.4th 1235, 1254–55 (Cal. Ct. App. 2009).  This is a question, ultimately, of the materiality of the alleged misrepresentation, which is for a jury to decide at trial rather than a court at the class certification stage, considering that California law ties materiality to a hypothetical reasonable person standard.  "California's consumer protection laws evaluate materiality under a reasonable person standard, not on an individualized basis . . . However, that is a question of fact to be determined at a later stage."  *Johns v. Bayer Corp.*, 280 F.R.D. 551, 558–59 (S.D. Cal. 2012).  *See also Astiana*, 2013 WL 3943265 at *9; *In re Tobacco II Cases*, 46 Cal.4th at 327.

Critically, relief under the UCL is available without any proof of deception, reliance, or damages.  *Brakke v. Economic Concepts, Inc.*, 213 Cal.App.4th 761, 772 (Cal. Ct. App. 2013); *In re Steroid Hormone Product Cases*, 181 Cal.App.4th 145, 154 (Cal. Ct. App. 2010) ("Therefore, while a named plaintiff in a UCL class action now must show that he or she suffered injury in fact and lost money or property as a result of the unfair competition, once the named plaintiff meets that burden, no further individualized proof of injury or causation is required to impose restitution liability against the defendant in favor of absent class members."); *Massachusetts Mutual Life Ins. Co. v. Superior Ct.*, 97 Cal.App.4th 1282, 1289 (Cal. Ct. App. 2002) ("[O]ur courts have not departed in any manner from the principle that liability for restitution under either the specific false advertising provisions of the [FAL] or the broader provisions of the UCL may be found without any individualized proof of deception and solely on the basis a defendant's

11cv0454

1   conduct was likely to deceive customers.").  As the Court has said above, this reflects a

2   policy decision of the California legislature, and it focuses the analysis on more the

3   objective conduct of the defendant rather than the plaintiffs' own circumstances.

4       This being the law of UCL and FAL claims, HP is simply mistaken to say that

5   individual questions both matter and predominate.  If a product is advertised with a

6   misrepresentation, that is more or less the end of it; it can be presumed at the class

7   certification stage that the consumer would have paid less for the product, or not

8   purchased it at all, with more accurate information.  This means there is a disparity

9   between their expected and received value.  *See Astiana*, 2013 WL 3943265 at *8–10.

10  HP's response to this is that it's a windfall to consumers who, as in this case, benefit from

11  one purchaser's unfortunate experience with a product or keen eye for its

12  representations.  (Opp'n Br. at 20.)  This both is and isn't true.

13      It's true to the extent that the UCL and FAL are extremely consumer-friendly

14  statutes that require very little to establish liability.  It isn't true because there are at least

15  two checks, as it were, that prevent runaway cases.  First, the UCL is an equitable statute

16  under which plaintiffs are generally limited to injunctive relief and restitution.  *Stearns*, 655

17  F.3d at 1020; *Massachusetts Mutual*, 97 Cal.App.4th at 1288 ("The UCL does not provide

18  for the recovery of damages or attorney fees.").  Moreover, it may well be that the

19  restitution amount in a case like this one is minimal.  HP may not be able to beat this case

20  entirely, but it certainly has presentable arguments for a small, relatively painless

21  restitution award: (1) the files not automatically backed up are actually used by less than

22  1 percent of the computer-using population; (2) studies show most people would have

23  bought the SimpleSave anyway, even if it didn't automatically back up everything; and (3)

24  even if the packaging says the SimpleSave backs up everything automatically, it also

25  says, as does the user manual, that it automatically backs up *most* files and that it can be

26  programmed to back up others.  The trier of fact may well hear the evidence and

27  arguments in this case and either find no material misrepresentation or else one that

28  merits a very small restitution award.  To the extent HP argues it can "face exposure from

1   thousands of SimpleSave purchasers even if, *inter alia*, a SimpleSave did not

2   automatically back up only one purchaser's files," it is putting the cart before the horse.

3   (Opp'n Br. at 20.)  Of course, Waller puts the value differential somewhere between $12

4   and $30 per hard drive, but these are all questions for the trier of fact to resolve; they

5   aren't for the Court to resolve at the class certification stage.

6         The second check on runaway cases is the requirement that class members at

7   least have been exposed to the misrepresentation.  As the court in *Konik* put it,

8   "Requiring demonstrable classwide exposure to the misstatements would further the

9   consumer protection laws' broad remedial purposes without granting windfalls to plaintiffs

10  who physically could not have relied on misrepresentations."  *Konik*, 2010 WL 8471923 at

11  *8.  This requirement substantially limits a defendant's exposure to UCL liability by

12  slashing the size of a potential class from all purchasers to only that subset that was

13  certainly exposed to the alleged misrepresentation at issue.

14              **2.**      **Uniformity of Alleged Misrepresentations**

15        The relevant class "must be defined in such a way as to include only members

16  who were exposed to advertising that is alleged to be materially misleading."  *Mazza*, 666

17  F.3d at 596.  *See also Stearns*, 655 F.3d at 1020 ("We do not, of course, suggest that

18  predominance would be shown in every California UCL case.  For example, it might well

19  be that there was no cohesion among the members because they were exposed to quite

20  disparate information from various representatives of the defendant.").  *Astiana*, 2013 WL

21  3943265 at *9 ("For purposes of class certification, it is sufficient that the alleged material

22  misstatement and omission was part of a common advertising scheme to which the entire

23  class was exposed . . . .");  *O'Shea*, 2011 WL 4352458 at *11.  The Ninth Circuit vacated a

24  class certification in *Mazza* on precisely this basis.  The alleged misrepresentations about

25  the Acura RL braking system appeared in product brochures and television commercials

26  that didn't give rise to a presumption of classwide reliance.  In other words, common

27  issues predominate when plaintiffs are exposed to common set of representations about

28  a product.  *In re Ferrero Litig.*, 278 F.R.D. 552, 560 (S.D. Cal. 2011).

1    Seizing on this principle, HP argues that putative class members in this case

2  weren't exposed to a uniform representation.  First, HP claims the packaging of the 1TB

3  SimpleSave differs from that of the 320 GB SimpleSave Waller originally purchased and

4  that inspired this lawsuit.  Second, it argues that to the extent the putative class includes

5  online purchasers, they may not have seen the representations at issue because website

6  listings and descriptions vary.  For example, the website RestockIt.com neither described

7  the SimpleSave or included text from the product packaging in the listing.  (Henning

8  Decl., Ex. D.)  Amazon.com appears to have included some text from the product

9  packaging in its listing, including the misrepresentations at issue, but it's not clear how

10  identical the Amazon listing is to the actual product packaging—or how responsible HP is

11  for Amazon's product description.  (*Id*., Ex. C.)

12    HP has a point here, but it can be addressed by simply modifying the class

13  definition as opposed to denying class certification outright.  The Court agrees that

14  inviting *all* SimpleSave purchasers to join this lawsuit is problematic, but especially those

15  online purchasers whose exposure to the alleged misrepresentations may well call for a

16  website-by-website analysis.  Online descriptions at the discretion of individual retailers

17  come closer in character to the brochures and commercials at issue in *Mazza*; it is hard to

18  guarantee that all online purchasers were exposed to the same misrepresentations that

19  inspired Waller to file this lawsuit.  *See Johns*, 280 F.R.D. at 558 ("But at a minimum,

20  everyone who purchased the Men's Vitamins would have been exposed to the prostate

21  claim that appeared on every package . . . .  That is the predominant issue, not whether

22  or not consumers also saw television or print advertisements.").  On the other hand, there

23  is evidence that Waller looked at both the 1 TB SimpleSave and the 320 GB SimpleSave

24  packages before his purchase and that both contained the same, identical alleged

25  misrepresentations.  The Court therefore finds that certification of a class of *all*

26  SimpleSave purchasers is not appropriate, but certification of a class of all *in-store*

27  purchasers of SimpleSave devices may be.  This will necessarily limit the class to

28  plaintiffs the Court can confidently say were actually exposed to the same, common

1   alleged misrepresentations.  *Johnson v. General Mills, Inc.*, 276 F.R.D. 519, 521 (C.D.

2   Cal. 2011).

3               **3.      Significance of the SimpleSave Update**

4        In August 2010, several months after Waller purchased his SimpleSave and after

5   he filed his original complaint in this case, HP released a free software update for the

6   SimpleSave that makes it automatically back up all file types.  (Main Decl. ¶¶ 15–18.)  HP

7   claims it started working on this update in early March, 2010, even before Waller filed his

8   first complaint.  (Main Decl. ¶ 19.)  Not only was the update free, but SimpleSave devices

9   were programmed to automatically check for updates like it when connected to the

10  internet.  (Main Decl. ¶ 20.)  HP doesn't make or market the SimpleSave devices any

11  longer, but the update is available to this day.  (Main Decl. ¶¶ 15–16.)  Also, all

12  SimpleSave devices released after August 2010 included the update, and automatically

13  backed up all of a user's files.  (Main Decl. ¶ 22.)  A forensic inspection of Waller's 320

14  GB SimpleSave confirmed that the software update was installed on it on August 21,

15  2010.  (Bandemer Decl. ¶¶ 6–12.)  Finally, Waller essentially conceded in his deposition

16  that the update addresses his grievance with the SimpleSave that is the basis of this

17  class action, bearing in mind this is a restitution and not a compensation case.  He was

18  asked, "If the thing were . . . updated to automatically back up all file types, that would

19  comport with your expectation at the time you bought it; is that right?"  He answered,

20  "Yes."  (Waller Dep. at 104:6–9.)  HP now argues that the availability of the software

21  upgrade cuts against class certification, for a number of reasons.

22        The first is that common questions can't possibly predominate when individualized

23  inquiries are necessary to determine whether class members took advantage of the

24  software upgrade.  It relies on *In re Toyota Motor Corp. Hybrid Brake Litig.*, 288 F.R.D.

25  445, 449 (C.D. Cal. 2013).  This case involved defective braking systems in the Prius and

26  Lexus HS 250h, which were recalled and given a software update to remedy the problem.

27  Following the recall, the plaintiffs filed a class action complaint.  The court refused to

28  certify the class, however, and among its reasons was that the named plaintiffs and

presumably most class members "suffered no actual injury, let alone a common one resulting from the same manifest defect." *Id.* at 450.  In other words, the injury determination "must be done by an individualized and particularized inquiry for each member of the proposed class." *Id.* at 449.  *Toyota* wasn't a misrepresentation case like this one, to be fair, but it was a UCL case and it's certainly persuasive.  Not only do individual issues potentially predominate when there's an available remedy for the grievance of the putative class, but the availability of that remedy calls into question the Court's very benefit-of-the-bargain theory of injury in this case.  If SimpleSave purchasers *did* receive, through the software update, a device that automatically saves all of their files, they can no longer argue that they paid more for the SimpleSave than they otherwise would have or that they would not have bought it at all.  And it is precisely *that* argument that has sustained Waller's class certification motion to this point.  With the upgrade, they now have just what they paid for.

HP's second argument, which it makes perhaps unknowingly by citing a case it thinks is more-or-less identical to *Toyota*, is that Waller isn't fairly and adequately protecting the interests of the class, pursuant to Rule 23(a)(4), because he's pursuing a remedy that is already available through a costly, drawn-out, and unnecessary class action lawsuit.  The authority is *In re Aqua Dots Products Liability Litig.*, 654 F.3d 748 (7th Cir. 2011).  This case involved a children's toy that was recalled after children ingested it and became sick, and for which refunds or product exchanges were made available.  The court affirmed the district court's judgment that class members would be better off returning their products for a refund or replacement than pursuing litigation.  It explained, "A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interest." *Id.* at 752.  There doesn't appear to be a refund offer in this case, but the restitution Waller seeks—$12 to $30—is precisely the lost value that the software upgrade makes up for.

HP's third argument is that with the availability of the software upgrade a class

action isn't "superior to other available methods for fairly and efficiently adjudicating the controversy," pursuant to Rule 23(b)(3).  The Seventh Circuit in *Aqua Dots* jumped on that argument to a degree, noting that a recall (and presumably an upgrade) isn't a form of "adjudication" under Rule 23, but a number of district courts have factored remedial measures taken by a defendant directly into the superiority analysis and found superiority to be lacking.  *See Pagan v. Abbott Labs.*, 287 F.R.D. 139, 151 (E.D.N.Y. 2012); *Webb*, 272 F.R.D. at 504–05; *In re PPA Products Litig.*, 214 F.R.D. 614, 622 (W.D. Wash. 2003); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 463 (D. N.J. 1998).  In *Pagan*, for example, which involved infant formula contaminated by beetle parts and larvae that had been recalled, the court said that "rational class members would not choose to litigate a multiyear class action just to procure refunds that are readily available here and now."  *Pagan*, 287 F.R.D. at 151.  In *Webb*, a familiar case involving the tagless clothing labels with toxic ink, the court was not persuaded that a class action was superior "because Carter's is already offering the very relief that Plaintiffs seek: it allows consumers to obtain refunds for the garments, even without a receipt, and reimburses consumers for out-of-pocket medical costs for treating skin irritation resulting from the tagless labels."  *Webb*, 272 F.R.D. at 504.  The court in *Webb* said the extent of public awareness of the refund program factored heavily into the superiority analysis, but that cuts heavily against Waller here because *everyone* who owned a SimpleSave and had an internet connection either received the update or at least was offered it.  Finally, *In re PPA Products Litig.* involved medicine containing PPA which was withdrawn from the market following a FDA health advisory.  The court noted that "defendants maintain refund and product replacement programs for individuals still in possession of PPA-containing products" and concluded that "[i]t makes little sense to certify a class where a class mechanism is unnecessary to afford the class members redress."  *In re PPA Products Litig.*, 214 F.R.D. at 622.  At least one district court, however, has agreed with the Seventh Circuit that this kind of "abstract economic choice argument" is tangential to Rule 23(b)(3)'s superiority requirement.  *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 2013 WL 1182733 at *11 (D. Me.

1   Mar. 20, 2013).

2       Waller's reply brief doesn't address the SimpleSave update at all.  It doesn't

3   address *Toyota*, or *Aqua Dots*, or any of the four cases cited by HP finding that recall or

4   refund programs kill superiority.  (By the Court's reading, Waller's motion for class

5   certification makes no mention of the update whatsoever.)  The one reference Waller

6   makes to the update, almost in passing, is in a statement that individual inquiries don't

7   predominate in this case because his UCL claim turns only on an assessment of HP's

8   conduct.  (Reply Br. at 3:5.)  But this misses the point, in two ways.

9       First, it isn't responsive at all to the *other* strong arguments HP makes in relation to

10  the update, namely that it destroys adequacy (the *Aqua Dots* argument) and that it

11  destroys superiority (the *Pagan*, *Webb*, and *In re PPA Products Litig.* argument).  In other

12  words, even if the SimpleSave update doesn't impact the class action analysis on the

13  predominance prong, it very well may impact the analysis on some other prongs.

14      Second, the architecture of class certification thus far has rested on the principle

15  that typicality is satisfied, and individual issues don't predominate, because the

16  SimpleSave allegedly doesn't work as represented and there is a fundamental economic

17  injury in that—an injury that's universal across the class of purchasers exposed to the

18  alleged misrepresentations.  As HP says in its own reply brief, "each prospective plaintiff

19  was damaged the moment he or she purchased the SimpleSave device, because the

20  device does not do what HP said it would do."  (Reply Br. at 3:8–9.)  The update takes

21  care of that, however, which pulls a critical pillar out from the architecture of a class

22  certification analysis that's otherwise favorable to Waller.  The UCL may not require any

23  individualized proof of deception, reliance, and injury, but what that really means is that it

24  doesn't require proof of deception, reliance, and injury *beyond* a buyer paying more for a

25  product than he otherwise would have.

26      Without that threshold economic injury, which is actually a statutory standing

27  requirement for named plaintiffs, a UCL case cannot get off the ground.  *See Hinojos*,

28  2013 WL 2159502 at *3 ("A consumer who relies on a product label and challenges a

1    misrepresentation contained therein can satisfy the standing requirement of section

2    17204 by alleging . . . that he or she would not have bought the product but for the

3    misrepresentation.") (quoting *Kwikset Corp. v. Superior Ct.*, 51 Cal.4th 310, 330 (Cal.

4    2011); *Astiana*, 2013 WL 3943265 at *8; *Guido*, 2013 WL 3353857 at *10 ("Relief under

5    the UCL and FAL is available without individualized proof of deception, reliance, and

6    injury so long as the named plaintiffs demonstrate injury and causation.") (internal

7    quotations and citation omitted).  It's true that Waller alleges injuries beyond the

8    diminished value of his SimpleSave, namely the cost of retrieving files that weren't

9    backed up, but the Court doubts that satisfies the injury and causation requirements for

10   standing in a restitution class action like this one.

11       Having given serious consideration to the significance of HP's software update for

12   the SimpleSave to Waller's motion for class certification, the Court finds that this is the

13   analytical juncture at which the motion fails.  Waller's motion for class certification is

14   therefore **DENIED**.

15                    **4.    Restitution**

16       To complete the analysis, anyway, the Court may as well address a final argument

17   HP raises against class certification, namely that Waller hasn't offered any reliable

18   method of calculating restitution *classwide*.  The Court disagrees.  "At class certification,

19   plaintiff must present a likely method for determining class damages, though it is not

20   necessary to show that his method will work with certainty at this time." *Chavez*, 268

21   F.R.D. at 379 (internal quotations and citation omitted).  Moreover, the amount of

22   damages, even if it is an individual question, does not defeat class certification. *Leyva v.*

23   *Medline Industries Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013).

24       In a restitution case like this one, as the Court has said, the core claim is that

25   plaintiffs bought an overpriced product—i.e., that they wouldn't have paid what they did,

26   or made the purchase at all, if the representations at issue had been more accurate.

27   There is an automatic financial injury in that, and it can be valued, as Waller suggests,

28   simply by calculating the cost differential between the SimpleSave's price and that of a

1   device that, like it, must be manually configured to save certain file types.  As in *Astiana*,

2   plaintiffs in this case "allege point-of-purchase loss and seek restitution in the form of a

3   refund of all or part of the purchase price."  *Astiana*, 2013 WL 3943265 at *10.  The Court

4   is satisfied here that they have a credible method to calculate that restitution amount for

5   all class members.

6   **IV.   Conclusion**

7         Waller's motion for class certification is **DENIED WITH PREJUDICE**.  The Court's

8   reason is singular: the availability of a free and automatic SimpleSave software update

9   that addressed the very shortcoming and alleged misrepresentation this case is about.

10  First, following *Aqua Dots*, the Court finds that Waller isn't fairly and adequately protecting

11  the class's interests under Rule 23(a)(4) by pursuing litigation to obtain a restitution

12  remedy that is already on offer in the form of the software update.  Second, it finds that a

13  class action isn't superior, under Rule 23(b)(3), to class members simply taking

14  advantage of the update and having a SimpleSave that works as allegedly represented to

15  work.  It makes this finding mindful of the holding of some courts that the update may not

16  be a form of "adjudication" under Rule 23(b)(3), but there is district court authority in the

17  Ninth Circuit on its side and no Ninth Circuit authority of which it is aware to the contrary.

18  Third, the availability of the update calls into question Waller's standing, and indeed that

19  of any plaintiff, to bring this case, considering that it makes up for any UCL injury.  Fourth,

20  the update undermines the core theory of typicality and predominance here, which is that

21  there was an automatic, economic injury incurred by all purchasers equivalent to the cost

22  differential between a SimpleSave that truly backs up all files automatically and the

23  SimpleSave Waller bought.  The Court again reiterates that these are serious arguments

24  from HP that it finds persuasive, and that Waller's reply brief seems to dodge them

25  entirely.

26        This case can now proceed with Waller going at it alone.  HP has already filed a

27  motion for summary judgment.  The Court will calendar that motion for oral argument on

28  Monday, November 25 at 11:30 a.m.  The parties' may calculate their respective briefing

1  deadlines based on that hearing date.[1]

2

3        **IT IS SO ORDERED**.

4  DATED: September 29, 2013

5

6        **HONORABLE LARRY ALAN BURNS**
        United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23  _____

24        [1] When the Court denied HP's motion to dismiss it said the procedural history of this
     case "raise[d] a reasonable suspicion that Waller is more interested in sharing attorney's fees
     in this case than actually vindicating consumers' rights." (Doc. No. 45 at 11:5–6.) It also said

25  "many SimpleSave purchasers who encountered the same frustration as Waller would have
     simply returned the hard drive or written it off as a regrettable purchase; they would not have

26  thought to file a class action lawsuit." (Doc. No. 45 at 6-9.) This appears to have given
     Waller some worry that the Court's impressions of his motivations may "carry the day for HP

27  in ruling on class certification." (Reply Br. at 7 n.4.)
        The Court assures Waller this is not the case. To the contrary, this Order reflects the

28  Court's sincere view that the law is *mostly* on Waller's side but that there is no getting around
     the problems for class certification posed by the software update.

11cv0454